# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-19-00898-CV

---

**City of Killeen Police Department, Appellant**

**v.**

**Gloria Fonseca, Individually and as Next Friend of Julia Fonseca; and Alberto Fonseca, as Next Friend of Julia Fonseca, Appellees**

---

**FROM THE 146TH DISTRICT COURT OF BELL COUNTY**
**NO. 304,579-B, THE HONORABLE JACK WELDON JONES, JUDGE PRESIDING**

---

## MEMORANDUM OPINION

This appeal arises from a collision between a police cruiser driven by Officer Boehmker of the Killeen Police Department and a vehicle driven by Gloria Fonseca. Gloria, on behalf of herself and as next friend to Julia Fonseca, along with Alberto Fonseca, acting only as next friend of Julia, subsequently sued the Department for the officer's alleged negligence and gross negligence. In a single issue on appeal, the Department contends the district court erred by overruling a plea to the jurisdiction predicated on governmental immunity from suit. The Fonsecas respond that the Texas Tort Claims Act (TTCA), Tex. Civ. Prac. & Rem. Code § 101.021(1) (providing exception to sovereign and governmental immunity where injury arises from use of motor vehicle), applies such that they can proceed with their claims. Because we conclude that the Fonsecas have produced evidence sufficient to create a fact issue as to whether Office Boehmker's conduct was reckless, *see id*. § 101.055(2) (setting forth

emergency-response exception to TTCA and limitation on that exception), and, consequently, whether the claim falls within the scope of the TTCA's waiver of immunity, we will affirm.

**BACKGROUND**

On December 2, 2016, a lieutenant with the Harker Heights Police Department called Officer Rollins, a Department officer, to inform him of a vehicle that she was "going to report" as stolen. Officer Rollins sent a text message to Officer Larson and Officer Boehmker telling them that "there was no report and the complainant just wanted it back." The next day, Officer Rollins received a call from the lieutenant describing the vehicle's location. Officer Rollins was not working that day and asked another officer to respond, but the vehicle was gone when that officer arrived. Later that day, Officer Rollins contacted Officer Boehmker, describing the vehicle as a red Ford Mustang with a white hood and a possible license plate of BSH 4019. Officer Rollins indicated that the vehicle would likely be in Officer Boehmker's patrol area that day and would soon be reported as stolen. According to Officer Boehmker, this vehicle was then "considered a suspicious vehicle."

It was overcast and raining when Officer Boehmker's shift started at 2 p.m. He began his patrol at a gas station, where he saw a red Mustang with a white hood. He called in the license plate as BSM 4019, later explaining in deposition that he had "made a mistake in running plates," as the first three characters turned out to be "BSH" not "BSM." Dispatch identified BSM 4019 as assigned to a Buick, and Officer Boehmker made "the assumption that if somebody was going to steal a vehicle, they're going to change the plates on the vehicle in an attempt to try to hide it in some way; so when the plates did not match, I knew that that was the vehicle I was looking for." He then called for a back-up officer.

2

Officer Larson arrived at the gas station, and Officer Boehmker pointed out the Mustang. When Officer Boehmker walked to the driver's side and asked to see identification, the driver patted his pockets as though looking for his wallet and rolled up the window. Officer Boehmker turned to Officer Larson and warned, "He's going to run!" The Mustang "left the parking lot at a high rate of speed before he had even hit the roadway." Officer Larson began pursuit with his emergency lights and sirens engaged and followed the Mustang westbound on FM 3470. Officer Boehmker returned to his cruiser, turned on his lights and sirens—which remained on for the entirety of his pursuit—and followed. Officer Boehmker later explained that he joined the pursuit because he "had a suspicious vehicle that, from [his] viewpoint, had a license plate that didn't match the original license plate given." He continued, "I had an individual that when confronted by a police officer fled the scene; and so we pursued." As Officers Larson and Boehmker began their pursuit, the Mustang was "driving not only erratically but also at a very high rate of speed," "weaving in and out of traffic," and "driv[ing] in a direction opposite to traffic," at times exceeding 70 miles per hour. In incident reports, Officer Larson stated that the Mustang ran a red light, and another officer stated, "The [M]ustang drove into oncoming traffic multiple times."

Officer Boehmker's dash-cam video reveals that Officer Boehmker could see Officer Larson ahead of him at the beginning of the pursuit and that the officers remained in "constant communication" by radio. Over the course of the pursuit, Officer Boehmker proceeded through several intersections against red and yellow lights, sounding his air horn frequently. After a few blocks, the Mustang turned right onto Trimmier Road, a four-lane byway that runs through much of downtown Killeen. Now northbound on Trimmier, Officer Boehmker approached Trimmier's intersection with Bacon Ranch Road. Although Officer Boehmker could

3

no longer see Officer Larson, Officer Larson told him that he had already passed through the intersection, continuing northbound on Trimmier. As he approached the intersection, Officer Boehmker was traveling 66 miles per hour in a 30-mile-per-hour zone. Trimmier's outside northbound lane was closed for construction, and there were over a dozen vehicles stopped in the inside northbound lane waiting at the light. In addition, a vehicle was stopped in the outside southbound lane, but there were no vehicles in the inside southbound lane. As Officer Boehmker later characterized it, he had "no other method of continuing the pursuit," so he decided to travel northbound on the inside southbound lane to pass the stopped vehicles.

After changing lanes, Officer Boehmker slowed down from 66 miles per hour to 51 miles per hour to get a better view of the intersection, which dash-cam video reveals was almost entirely obscured by the lines of northbound and eastbound vehicles waiting at the light. Confident that he had "visually cleared" the intersection, he then accelerated to 56 miles per hour to proceed through the red light and continue northbound on Trimmier. He could not do so, however, because before he reached the intersection, the Fonsecas' vehicle, heading westbound on Bacon Ranch, proceeded on a green light and turned directly into Boehmker's intended path. Although Boehmker swerved to his left and tried to slow down, he was unable to avoid a head-on collision with the Fonsecas. Dash-cam video suggests that Boehmker would not have been able to see the Fonsecas turning toward him due to the line of vehicles in the northbound lane. After the collision with the Fonsecas' vehicle, Boehmker's cruiser then collided with a second vehicle, which was waiting at the light in the eastbound lane of Bacon Ranch.

The Texas Peace Officer's Crash Report of the incident includes the following diagram:

4



Field Diagram - Not to Scale

The diagram was accompanied by a summary of the incident:

Unit 1, police unit, was pursuing a vehicle northbound on Trimmier Rd. approaching Bacon Ranch Rd. (KPD 16-015303) Unit 2 [the Fonsecas' vehicle], was westbound on Bacon Ranch Rd. attempting to turn southbound onto Trimmier Rd. Unit 3 was stopped, facing eastbound waiting to proceed eastbound on Bacon Ranch Rd. At the time of the wreck, it was raining; the roadway on the southside of the intersection has four lanes (2 NB 2 SB). On the north side of the intersection there is five lanes (3 SB 2 NB); Bacon Ranch Rd. has two lanes (1 EB 1 WB) and it is not marked with stripes. On the west side of the intersection, is a private driver enter/exit into a business area that does not have marked lanes. On the west side of Trimmier Rd. there is a sidewalk. The northbound outside lane is shut down with barriers for ongoing construction; there were no construction workers present. As unit 2 was turning southbound, unit 1 proceeded northbound, passing multiple vehicles on the left (oncoming lane of travel) in a congested area where visibility was limited. Once unit 2 completed the turn, unit 1 made faulty evasive action by applying brakes and going from the inside southbound lane to the outside southbound lane. After the first impact, unit 1 continued northbound and struck unit 3.

5

Officer Boehmker subsequently learned the Department had classified the collision as "preventable." He later disputed these characterizations, explaining, "I personally don't believe I committed a faulty evasive action."

Following the collision, Officer Larson continued pursuing the Mustang. He ultimately apprehended the Mustang's driver, whom a background check identified to be a convicted felon. As it turned out, however, the Mustang was not stolen. The driver was one of two registered owners of the vehicle, and his co-owner had "attempted to file the vehicle as stolen" due to a domestic dispute.

The Fonsecas sued the Department for Officer Boehmker's alleged negligence and per se negligence. The Department responded with a plea to the jurisdiction, arguing that the suit is barred by governmental immunity and that no exception applies. The Fonsecas amended their suit to include a claim of gross negligence, and the Department amended its plea accordingly. After an evidentiary hearing on jurisdiction, the district court denied the Department's plea, and this appeal followed.

## STANDARD OF REVIEW

Immunity from suit implicates a court's subject matter jurisdiction and is properly asserted in a plea to the jurisdiction, *Nettles v. GTECH Corp.*, 606 S.W.3d 726, 731 (Tex. 2020); *Alamo Heights Indep. Sch. Dist. v. Clark*, 544 S.W.3d 755, 770 (Tex. 2018). When a governmental entity challenges jurisdiction on immunity grounds, the plaintiff's burden to affirmatively demonstrate jurisdiction includes the burden of demonstrating a waiver of immunity. *See Town of Shady Shores v. Swanson*, 590 S.W.3d 544, 550 (Tex. 2019); *Ryder*

*Integrated Logistics, Inc. v. Fayette County*, 453 S.W.3d 922, 927 (Tex. 2015) (per curiam); *Texley Inc. v. Hegar*, 613 S.W.3d 322, 326 (Tex. App.—Austin 2020, no pet.).

A jurisdictional plea may challenge the pleadings, the existence of jurisdictional facts, or both. *Alamo Heights*, 544 S.W.3d at 771. When a jurisdictional plea challenges the pleadings, we determine if the plaintiff has alleged facts affirmatively demonstrating subject matter jurisdiction. *Id.* When determining whether the plaintiff has satisfied that burden, we liberally construe the pleadings and look to the plaintiff's intent. *Texas Dep't of Criminal Justice v. Rangel*, 595 S.W.3d 198, 205 (Tex. 2020). If the movant's plea challenges the existence of jurisdictional facts and, as in this case, those jurisdictional facts implicate the merits of the plaintiff's claim, the standard of review mirrors that of a traditional summary judgment. *Alamo Heights*, 544 S.W.3d at 770–71. If the plea is accompanied by supporting evidence, to avoid dismissal, the plaintiffs must raise at least a genuine issue of material fact to overcome the challenge to the trial court's subject matter jurisdiction. *Id.* at 771. We review the disposition of a plea to the jurisdiction de novo. *Nettles*, 606 S.W.3d at 731.

## DISCUSSION

In a single issue consisting of two discrete arguments, the Department contends the district court erred by overruling its plea to the jurisdiction because it is entitled to governmental immunity. Generally, governmental entities are immune from suits seeking to impose tort liability, *see Harris County v. Sykes*, 136 S.W.3d 635, 638 (Tex. 2004), but the TTCA provides a limited waiver of immunity for damages arising from the use of a motor vehicle, *see* Tex. Civ. Prac. & Rem. Code § 101.021(1), and *Ryder*, 453 S.W.3d at 927. The Fonsecas rely on this waiver as a basis to pursue their claims. In response, the Department

asserts the emergency-response exception to that waiver, which provides, "This chapter does not apply to a claim arising . . . from the action of an employee while . . . reacting to an emergency situation if the action is in compliance with the laws and ordinances applicable to emergency action[.]" Tex. Civ. Prac. & Rem. Code § 101.055(2) (the emergency-response exception). Yet the exception itself also has a limitation: it is only applicable "if the action is in compliance with the laws and ordinances applicable to emergency action, or in the absence of such a law or ordinance, if the action is not taken with conscious indifference or reckless disregard for the safety of others." *Id*. Here, the Department argues: (1) that the TTCA does not apply because "the officer was reacting to an emergency situation," and (2) that the Fonsecas cannot avail themselves of the limitation on the emergency-response exception because "Officer Boehmker did not act recklessly or in conscious disregard of the safety of others." Assuming that the Department is correct that the emergency-response exception otherwise applies, we will consider whether the Fonsecas have satisfied their burden to generate a fact issue as to whether they benefit from the exception's limitation. *See* Tex. R. App. P. 47.1.

The limitation on the emergency-response exception is phrased in the disjunctive. The person undertaking the action must either comply with all applicable laws and ordinances, or, if no such law or ordinance applies, avoid acting with conscious indifference or reckless disregard for the safety of others. The parties have not identified any applicable local ordinance, *cf*. *id*. R. 38.1(i), 38.2(a)(1) (requiring parties to include citations to relevant authority), but under state law, the pursuit is governed by certain provisions in Chapter 546 of the Transportation Code:

In operating an authorized emergency vehicle[,] the operator may:

(1) park or stand, irrespective of another provision of this subtitle;

(2) proceed past a red or stop signal or stop sign, after slowing as necessary for safe operation;

(3) exceed a maximum speed limit, except as provided by an ordinance adopted under Section 545.365, as long as the operator does not endanger life or property; and

(4) disregard a regulation governing the direction of movement or turning in specified directions.

Tex. Transp. Code § 546.001. This provision, however, "does not relieve the operator of an authorized emergency vehicle from: (1) the duty to operate the vehicle with appropriate regard for the safety of all persons; or (2) the consequences of reckless disregard for the safety of others." *Id*. § 546.005.

The question thus becomes whether the Fonsecas have produced sufficient evidence to generate a genuine issue of material fact as to whether Officer Boehmker failed to operate the vehicle with appropriate regard for the safety of others or operated it with reckless disregard for the safety of others. The Supreme Court of Texas has made clear that the statutory phrases "appropriate regard" and "reckless disregard" both require a showing of recklessness before liability may be imposed. *See City of Amarillo v. Martin*, 971 S.W.2d 426, 430–31 (Tex. 1998) (analyzing similar language in statutory predecessor). The Court further clarified, "[T]o recover damages resulting from the emergency operation of an emergency vehicle, a plaintiff must show that the operator has committed an act that the operator knew or should have known posed a high degree of risk of serious injury—in other words, that the operator has acted recklessly." *Kolster v. City of El Paso*, 972 S.W.2d 58, 59 (Tex. 1998).

In this case, the interlocutory record includes certain undisputed evidence that suggests Officer Boehmker knew or should have known his actions would pose a likelihood of

9

serious injury to others on or near FM 3470, Trimmier, and Bacon Ranch. It is undisputed that it was overcast, raining, and that the roads were slick and dangerous. Furthermore, Officer Boehmker conceded in deposition that he was aware of these facts. It is equally undisputed that Officer Boehmker was traveling nearly twice the speed limit on these slick roads and was in fact accelerating toward the intersection, notwithstanding the weather conditions and the heavy traffic at the intersection, before braking to try to avoid the collision when his cruiser collided with the Fonsecas' vehicle. *Cf. Gomez v. City of Houston*, 587 S.W.3d 891, 902 (Tex. App.—Houston [14th Dist.] 2019, pet. denied) (reversing trial court's grant of plea to jurisdiction where undisputed evidence showed officer "was aware of the rainy weather and wet streets, but he did not reduce his speed below the posted speed limit to mitigate these risks"). Officer Boehmker also knew he was serving as "back up" to Officer Larson and maintained constant communication with Officer Larson throughout the chase, and yet proceeded as though he was the only one in pursuit. And while his Department's policy does require pursuing vehicles to "stay as close behind the fleeing vehicle" as possible, that is true only to the extent that "safety allows." *Killeen, Tex., General, Orders, Policies, and Procedures—Part B—Enforcement Operations—Vehicle Pursuit Policy* § 41.2.3a (2015).

Turning to disputed evidence on the issue, Officer Boehmker testified at deposition that he had slowed down and visually "cleared the intersection of any kind of traffic," but that characterization is undermined by the dash-cam video, which shows the intersection almost entirely obscured by the vehicles lined up along Trimmier and Bacon Ranch, and in his affidavit Officer Boehmker himself characterized his view as "blocked" by the traffic. *See Rogers v. City of Houston*, 627 S.W.3d 777, 790 (Tex. App.—Houston [14th Dist.] 2021, no pet.) (explaining that video can generate question of fact). In addition, the Department's

10

crash report described the area as "congested" with "limited visibility." And although Officer Boehmker disagrees with the characterization, his own Department concluded that he had executed a "faulty evasive action" that led to the collision and that the collision could have been prevented.

Finally, there is at least some evidence that Officer Boehmker violated his Department's policy governing the pursuit of suspects. That policy provides:

3. The pursuing officer shall consider the following factors in determining whether to initiate pursuit:

    a. The performance capabilities of the pursuit vehicle;

    b. The conditions of the road surface upon which the pursuit is being conducted;

    c. The amount of vehicular and pedestrian traffic in the area;

    d. Weather conditions; and

    e. The nature or seriousness of the traffic violation giving rise to the attempted stop.

*Killeen, Tex., General, Orders, Policies, and Procedures—Part B—Enforcement Operations—Vehicle Pursuit Policy* § 41.2.2a (2015). Here, at least three of the five factors weigh against pursuit. Knowing violation of policy can, in some circumstances, rise to the level of recklessness. *See Kaufman County v. Leggett*, 396 S.W.3d 24, 30 (Tex. App.—Dallas 2012, pet. denied) (affirming denial of plea to jurisdiction where plaintiff alleged [officer's] conduct "was in violation of department policies for the operation of patrol units"); *but see City of Laredo v. Varela*, No. 04-10-00619-CV, 2011 WL 1852439, at *5 (Tex. App.—San Antonio May 11, 2011, pet. denied) (mem. op.) (reversing denial of plea to jurisdiction even though officer "fail[ed] to comply with the department's policy").

11

In its plea to the jurisdiction and in its brief to this Court, the Department heavily emphasizes the undisputed facts that Officer Boehmker continuously used his emergency lights and sirens and frequently used his air horn "as an extra precaution" while engaged in the pursuit, and that he slowed down to inspect the intersection between Trimmier and Bacon Ranch before attempting to enter it. But we are aware of no authority holding that the use of lights and sirens is alone sufficient to preclude a finding of recklessness. The Department also emphasizes the fundamental purpose of the emergency-response exception, which is to allow law enforcement to conduct its business without fear of post hoc judicial second-guessing of its actions. *See Martin*, 971 S.W.2d at 429–30. Yet while the Department is correct about the purpose of the exception, we must not construe that purpose so broadly as to render the legislative protection of the public, as set forth in Section 546.005, meaningless. *See Kerrville State Hosp. v. Fernandez*, 28 S.W.3d 1, 8–9 (Tex. 2000).

On this record, viewed under the governing standard, we conclude that the Fonsecas have satisfied their burden to raise a genuine issue of material fact as to whether Officer Boehmker acted recklessly and without regard for the safety of others during his pursuit of the suspect. As such, the Department's plea to the jurisdiction was properly overruled. We overrule the Department's sole issue on appeal.

## CONCLUSION

Finding no error in the district court's order overruling the plea to the jurisdiction, we affirm.

12

_____

Edward Smith, Justice

Before Justices Goodwin, Kelly, and Smith
   Dissenting Opinion by Justice Goodwin

Affirmed

Filed:   December 23, 2021